**Annie Mae MOORE, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 62 C 77(3).

United States District Court
E. D. Missouri, E. D.

Sept. 4, 1963.

Theodore S. Schechter, Clayton, Mo., for plaintiff.

Richard D. FitzGibbon, U. S. Atty., Donald L. Schmidt, Asst. U. S. Atty., St. Louis, Mo., for defendant.

REGAN, District Judge.

Plaintiff seeks recovery under the Federal Tort Claims Act, Title 28 U.S.C.A. § 2671 et seq., against the United States, for the alleged wrongful death of her husband, Dee Moore, resulting from a fall from a third floor window while he was a patient in Jefferson Barracks Veterans Administration Hospital. Plaintiff claims that while deceased was a patient at said hospital, and under the care and attention of defendant, acting by and through its servants, agents, and employees, defendant negligently and carelessly failed to look after, attend, guard, restrain or care for deceased, and as a result of such negligence, deceased, while so incapacitated, mentally and physically, as to be unable to care for himself, was permitted to fall from the window and suffer injuries resulting in his death.

The case was tried to the Court without a jury and submitted on briefs and argument of counsel. The cause being fully considered, the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1: Dee Moore was admitted to the Veterans Hospital at Jefferson Barracks, Missouri, on November 30, 1961, at 6:00 o'clock P.M., and was placed in Ward 1-W-2, an open medical ward. The preadmittance diagnosis was arteriosclerosis. Such diagnosis did not routinely require placement in a closed ward.

2: The patient had no history of mental illness. The preadmittance examination revealed no signs of suicidal tendencies, or psychiatric disorder of any kind. The patient was cooperative and lucid, and fully in command of himself.

3: During the early evening of December 3, 1961, the head nurse of Ward 1-W-2 observed peculiar behavior on the part of patient Moore. He manifested disorientation and fear. The O.D., Dr. Richard Daniels, a qualified psychiatrist, was called. He examined Moore and found him to be delusional, disoriented, paranoid and in fear for his life. The hospital record showed no gross changes in vital physical signs. Moore manifested no suicidal tendencies.

4: On Dr. Daniels' orders, Moore was transferred to Ward 1-W-3. Ward 1-W-3

was a closed ward. The doors were kept locked and heavy detention screens were placed over the windows. The bathrooms in the ward are unlocked and the ward barber chair was kept in a bathroom. Locked razors and silverware count were routine. There was a higher number of personnel per patient in the ward than in open wards, and they were specially oriented to the care of patients with psychiatric problems. Two procedures were followed in regard to patients assigned to the ward: the normal procedure for psychiatric patients with physical disorders, and a special procedure for those who evidenced suicidal tendencies and were likely to injure themselves. All patients are allowed freedom about the ward if they are ambulatory. The patients receiving special procedures, however, were more closely watched.

5: In the opinion of Drs. Edwin Gildea and Edwin Satterfield, who qualified as experts in the treatment of psychotic patients, the facilities, care and security provided at Jefferson Barracks Hospital was comparable to that of other hospitals in the community.

6: During the early morning hours of December 4th, Mr. Moore manifested his mental disturbance by hiding for a time under another patient's bed, sleeplessness, and repeating a desire to call his wife to warn her that someone was trying to kill her. He continued during the morning of that day to express fear but cooperated in tasks necessary for medical tests. He displayed no suicidal tendencies and was not designated by the doctor in charge as a patient to be placed on suicidal precautions.

7: At 1:00 o'clock P.M., Mr. Moore was taken to the x-ray department where x-rays were not completed because Moore evidenced fear of the machine. The hospital record shows that he was returned to the ward at 1:30 o'clock P.M. The recollection of the escorting attendant would place their return at 2:15 o'clock P.M. The evidence revealed that at 2:25 o'clock P.M., Moore was seen by an attendant entering the bathroom.

8: At 2:30 o'clock P.M., Mr. Moore was found lying on the ground below the ward bathroom window, and a part of the headrest from the barber chair was on the ground beside him. The evidence indicates that Moore went into the bathroom, dismantled the headrest from the barber chair, used the bar of the headrest to pry open the detention screen, and then jumped or fell from the window.

## DISCUSSION

The briefs submitted indicate that no contention is made that the diagnosis by Dr. Daniels on December 3, and the assignment of Moore to Ward 1-W-3 constituted negligent conduct. In fact the parties agree that any diagnosis and ward assignment would be within the area of discretion which is made unactionable under Section 2680. See Fahey v. United States, D.C., 153 F.Supp. 878. It is plaintiff's position that, at the point of the transfer to suitable facilities, discretion ended, and the subsequent conduct and omissions on defendant's part constituted negligence. Specific conduct alleged to be negligent includes (a) the failure of persons in charge to know that Moore might injure himself; (b) the failure of the doctor and nurses in charge of the ward to read Dr. Daniels' transfer order; (c) the accessibility of a dangerous instrument (the removable headrest), and (d) the failure to sufficiently supervise.

Before considering the specific allegations of negligence, the standard of duty should be stated. The statute imposes the same duty upon the defendant as would be imposed by law upon a private person under like circumstances. Missouri law imposes the duty to exercise such reasonable care to safeguard and protect the patient from injuring himself as his known mental condition requires. Stallman v. Robinson, 364 Mo. 275, 260 S.W.2d, 743 (1953), Davis v. Springfield Hospital, 204 Mo.App. 626, 218 S.W. 696. The Federal Tort Claims Act does not make the United States an insurer of the safety of patients in a Veterans Administration hospital. It cannot be liable for injury which a reasonable person would

not anticipate under the circumstances. United States v. Gray, 10 Cir., 199 F.2d 239; Sklarsh v. United States, 2 Cir., 194 F.Supp. 474; Dugan v. United States, D.C., 147 F.Supp. 674.

 The evidence before the Court indicates that at no time did Moore manifest suicidal tendencies. Rather, he manifested an intent to avoid supposed dangers and sought to stay alive. The patient's conduct before his death indicated that he was unable to make correct judgments and, to that extent, might act in such a way as to unintentionally cause injury to himself. Because of his mental disturbance, he was placed in a closed ward to guard against normal dangers, and because there was no manifestation of suicidal tendencies, he was not designated a patient to receive the special procedures of the ward. Such a designation could be made only by a doctor based upon diagnosis revealing such need. The designation, therefore, is properly in the area of diagnostic discretion. But even if the failure to give Moore the special procedures for suicidal patients were not in the area of discretion, plaintiff has failed to show that defendant had reason to anticipate the self-destroying conduct here involved. Stallman v. Robinson, supra. See Breeze v. St. Louis & San Francisco Railway Co., 264 Mo. 258, 174 S.W. 409; Lange v. United States, D.C., 179 F.Supp. 777. At most, it can only be said from the evidence that where a mental disturbance results from infirmity such as Moore's, any conduct should not, after the fact, be totally unexpected.

Plaintiff's proof, on cross-examination, of possible negligent conduct on account of the failure of the doctor and nurse in charge to read Dr. Daniels' transfer order cannot be the basis for liability. The transfer order gives no indication of suicidal tendencies, and does not prescribe special procedures. The failure to read the order is not causally connected with the injury.

 The Court is not convinced that the presence of the barber chair or the lack of constant supervision over Moore was negligent conduct in his care and treatment where there is no evidence of suicidal tendencies. Under the circumstances, defendant, as an ordinarily prudent person, could not have anticipated the conduct of Moore.

The Court, therefore, makes the following conclusions of law and directs the clerk to enter judgment in accordance therewith.

CONCLUSIONS OF LAW

1: This Court has jurisdiction over the subject matter and the parties.

2: The plaintiff has failed to carry its burden of proving negligence under the facts and circumstances of this case.

3: The defendant is entitled to judgment dismissing the complaint with prejudice.